## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MARION D. JOLLY, et al.,**

      **Plaintiffs**

    **v.**                **Case No. 1:17–cv–00392**
                                **JUDGE DOUGLAS R. COLE**

**DYNEGY MIAMI FORT, LLC, et al.,**

      **Defendants.**

### OPINION AND ORDER

This cause is before the Court pursuant to both (1) Plaintiffs Marion Jolly and Randy Jolly's Partial Motion For Summary Judgment, and (2) Defendants Dynegy Miami Fort, LLC and Dynegy, Inc.'s (together, "Dynegy") Motion For Summary Judgment, in this negligence case (Docs. 65, 66). The Court held oral argument on those competing motions on October 6, 2020. From the briefing and argument, it is clear that the parties have divergent views as to Dynegy's involvement in the events leading up to Jason Jolly's death in a horrific workplace accident. The question before the Court, though, is whether those divergent views give rise to a genuine dispute of material fact that requires jury resolution. For the reasons discussed more fully below, the Court concludes that they do not, and thus **GRANTS** Dynegy's Motion (Doc. 65), **DENIES** Plaintiffs' Motion (Doc. 66), and **ENTERS SUMMARY JUDGMENT** in Dynegy's favor.

## FACTUAL BACKGROUND

Plaintiffs Marion Jolly and Randy Jolly assert claims in this action, both individually and as co-administrators of Jason Everett Jolly's estate, relating to Jason Jolly's death. Although there are several aspects to Plaintiffs' claims, all of them stem from a fatal accident Jason Jolly suffered while working at Miami Fort Station, a power station in Hamilton County, Ohio, that Dynegy owned and operated. (*See* First Am. Compl. ("FAC"), Doc. 21, #461–71). At the time of the accident, Headwaters CM Services, LLC (Headwaters) employed Jolly. (Statement Of Proposed Undisputed Facts, ("SPUF"), Doc. 65-1, ¶ 4, #4673). Dynegy and Headwaters operated under a "Master Purchase Order Agreement," pursuant to which Headwaters performed certain services for Dynegy at the Miami Fort Station. (*Id.* at ¶ 2). The services that Headwaters provided (which the contract defined as "the Services") generally related to maintaining a landfill that Dynegy operated. (Waldroff Depo., Doc. 59, #3753); (Master Purchase Order Agreement, Doc. 55-2, #2817). Per the Master Purchase Order Agreement, Headwaters acted as an "independent contractor" in supplying the Services to Dynegy, and therefore Headwaters retained "complete and authoritative control as to the details of performing the Services" at the Miami Fort Station. (Master Purchase Order Agreement, at #2813).

Jolly's tragic demise resulted from events that transpired at the Miami Fort Station on May 16, 2016, and May 17, 2016. On those days, two Headwaters employees, Rob Myers and Dave Jackson, worked with Jolly at the site—Jackson and Myers served as equipment mangers, while Jolly was the foreman and on-site supervisor. (SPUF, at ¶¶ 5–7). The three also worked alongside a Dynegy employee,

Joshua Waldroff, who was Dynegy's "by-products coordinator." (*Id.* at ¶ 8). In that role, Waldroff managed truck traffic and oversaw ash ponds and landfills at various sites, including the Miami Fort Station. (Waldroff Depo., at #3705). Waldroff, a licensed professional engineer, retained final decision-making authority over work performed at Dynegy's properties. (*Id.* at #3791). He also served as a liaison between Dynegy and Headwaters' employees, often telling the Headwaters crew what projects needed to be performed at the Miami Fort Station site. (SPUF, at ¶ 10). Although Waldroff neither told the Headwaters employees how to perform specific tasks, nor constantly observed the crew, he would check in with them multiple times per day. (Waldroff Depo., at #3753).

**A.    Heavy Machinery Became Stuck While Jolly And His Headwaters Coworkers Tried To Clean A Chimney Drain.**

On May 16, 2016, Jolly and other Headwaters employees arrived to clean chimney drains in the Miami Fort Station landfill and to clear out the surrounding area. (SPUF, at ¶ 11). Chimney drains are plastic pipes roughly four to six inches in diameter that drain water out of landfills. (*Id.* at ¶ 12). Fly ash sediment had gathered around the chimney drain, clogging it. So the Headwaters crew needed to remove some of the fly ash material from around the chimney drain in order to unplug it. To accomplish this, the Headwaters crew used a Komatsu PC350 Excavator, both to dig around the chimney drain and to haul out sediment loads. (SPUF, at ¶ 16).

On May 17, though, the excavator became stuck in the landfill. (*Id.* at ¶ 22). One of Jolly's Headwaters co-workers, Jackson, told Jolly that he believed a second excavator or a track hoe would be necessary to free the immobilized excavator. (*Id.* at

¶ 23). Jolly agreed with Jackson and told Waldroff that the crew needed another piece of machinery. (*Id.* at ¶ 24). So Waldroff rented a Caterpillar 316 Track Hoe for the Headwaters crew. (*Id.* at ¶ 25). But when the Headwaters crew used the Caterpillar track hoe to dig around the excavator's tracks, the track hoe also became mired in the landfill. (*Id.* at ¶ 26).

With two pieces of heavy machinery now stuck, the Headwaters crew began working on a plan to free both machines. To begin, Jolly and Waldroff discussed whether Dynegy had any straps or slings on site.[1] (*Id.* at ¶ 27). Waldroff responded that he "[did] not know what [Dynegy] stock[ed]," but he unlocked the Miami Fort Station's tool room so Jolly and Myers could enter and see for themselves. (Waldroff Depo., at #3675). Dynegy owned the equipment in the tool room, and only Dynegy personnel (or personnel authorized by Dynegy) could use the tool room's contents. (*Id.* at #3679–80).

Inside the room, Waldroff showed the two Headwaters employees where the straps and slings were stored. Jolly and Myers examined the synthetic straps and clevises and asked whether there were any larger straps. Jolly spied some on the wall and asked Waldroff "what about these?" *(Id.* at #3683*)*. Waldroff then permitted Jolly to select the synthetic straps and clevises Jolly wanted to use and to take those items away from the tool room. (*Id.* at #3686). Although Waldroff had the right to refuse

---

[1] The parties dispute whether Jolly or Waldroff first suggested using straps. Dynegy asserts that Jolly approached Waldroff about the straps Dynegy kept on site, but Plaintiffs respond that the record does not reveal whether Jolly first suggested using straps. (*See* SPUF, at ¶ 27; Plaintiffs' Response To The Dynegy Defendants' Proposed Undisputed Facts And Statement Of Proposed Disputed Issues Of Material Fact, Doc. 70, ¶ 27, #4743). It is undisputed, though, that Jolly and Waldroff discussed the issue of what straps Dynegy may have on site.

tools to Jolly, he viewed his role as "provid[ing] him anything he needed." (*Id.* at 3685). Waldroff further testified that he allowed Jolly to select the equipment despite not being "aware of what his plan was to connect the two pieces of equipment." (*Id.*).

With the synthetic straps in hand, the Headwaters crew returned to where the equipment was stuck. Well before the incident at issue here, Headwaters had adopted a policy known as a Job Hazard Analysis ("JHA") in January 2016 that outlined safe procedures for extricating heavy equipment on a job site. (SPUF, at ¶ 29). That policy directed Headwaters employees to use only steel cables—not synthetic straps or slings—to free immobilized equipment like track hoes and excavators. (*Id.* at ¶ 30). Jackson and Myers, the two Headwaters employees who worked alongside Jolly during his fatal accident, had received JHA training about towing procedures, but Jolly himself never underwent that training. (*Id.* at ¶ 31). Headwaters never notified Dynegy about this new safety policy. (*Id.* at ¶ 32).

**B.    Waldroff And The Headwaters Crew Attempted To Free The Equipment, Causing Jolly's Death.**

Using the equipment they had retrieved from Dynegy's tool room, Jolly and the two other Headwaters employees successfully towed the Caterpillar track hoe from the landfill. (SPUF, at ¶ 40). They did so by employing a Komatsu D65 bulldozer that Headwaters had on site. More specifically, the Headwaters team used the straps and clevises from the tool room, plus a strap and clevis they had on site, to attach the bulldozer to the track hoe. (*Id.* at ¶¶ 39–40). With Jackson steering the track hoe, Jolly manned the bulldozer to drag the track hoe out of the landfill. (*Id.*)

After the Headwaters team successfully freed the track hoe, Waldroff asked Jolly if they team needed a larger piece of equipment or more crewmembers to extricate the excavator. (*Id*. at ¶ 43). Jolly demurred, stating that he wanted to "try" to free the excavator with the tools and staff on hand before calling for additional resources. (Waldroff Depo., at #3693).

In an effort to remove the excavator, the Headwaters crew decided to use both the Komatsu bulldozer and the (now freed) Caterpillar track hoe. More specifically, they used the track hoe's buck to engage with the front blade on the bulldozer, essentially linking the two together so the two pieces of equipment could pull the excavator in unison. The Headwaters crew then used the synthetic straps and clevises that Jolly had obtained from the Miami Fort Station's tool room, plus the strap and clevis they had with them, to attach the bulldozer to the stuck excavator. (SPUF, at ¶ 45). Basically, the workers connected three straps from the tool room, plus the strap that Headwaters already had on hand, to form a MacGyver-esque, end-to-end synthetic-strap chain. They planned to attach one end of that chain to the stuck excavator and the other end to the bulldozer, which (acting in conjunction with the track hoe) would then pull the excavator from the landfill.

Waldroff aided the Headwaters employees in connecting the straps. (*See* Waldroff Depo., at #3708). In particular, he noticed that the Headwaters crew was struggling to connect the strap at the back of the bulldozer. He learned that the pin on the back of the bulldozer was too large for the clevis that was attached to the strap, so they could not put the clevis (a sort of horseshoe-shaped coupler) over the pin. To

6

assist, Waldroff showed them how to make a "basket connection." (*Id.* at #3709). A "basket connection" is basically a type of knot in the strap. In essence, the men tied the strap to the back of the bulldozer, rather than using the clevis to make the connection. Waldroff testified that using a basket connection produces a "much stronger" link between the strap and the pin than the knots that the Headwaters crew first thought to use. (*Id.*). The Headwaters crew lacked familiarity with how to form a basket connection, so Waldroff assisted them by directing Jolly and the others to "shove [the straps] through like this and connect them." (*Id.*).

After the men finished connecting the straps and the equipment, Jolly operated the bulldozer, Myers operated the track hoe, and Jackson took the wheel of the stuck excavator. Using the bulldozer and the track hoe in combination, Jolly and Myers sought to pull the excavator free. (SPUF, at ¶¶ 46–48).

The combined pulling force of the two pieces of heavy equipment put significant strain on the synthetic straps connecting the bulldozer to the mired excavator. One of the straps in the three-strap chain snapped. (Waldroff Depo., at #4407). Because of the sudden release in tension, the strap connected to the bulldozer contracted (almost like a rubber band), sling-shotting the clevis on the far end of that strap toward the bulldozer. That clevis crashed through the rear window of the bulldozer, striking Jolly in the back and gravely injuring him. (SPUF, at ¶ 49). Waldroff, Myers, and Jackson immediately went to Jolly's aid. (*Id.* at ¶ 50). Waldroff called for emergency services— paramedics soon arrived and removed Jolly from the bulldozer. (*Id.* at ¶¶ 51–52).

Jolly's injuries were too severe, though, and emergency personnel pronounced him dead at the scene. (*Id.* at ¶ 53).

## PENDING MOTIONS

Following Jason Jolly's death, Plaintiffs filed a complaint alleging that Dynegy's negligence caused the fatal accident. They argue that Dynegy should be held liable under Ohio law (this is a diversity action, to which Ohio law applies) because its employee, Waldroff, "actively participated" in events causing Jolly's death, i.e., directing work activities performed on Dynegy's property, or exercising control over a "critical workplace variable." *See Sopkovich v. Ohio Edison Co.*, 693 N.E.2d 233, 242 (Ohio 1998). Plaintiffs also allege that Dynegy violated express and implied warranties about the safety of its premises and equipment.

After the close of discovery, Dynegy filed for summary judgment on all of Plaintiffs' claims. Plaintiffs likewise cross-moved for partial summary judgment. The Court held a hearing on October 6, 2020 regarding these summary judgment motions.

## A.    The Parties' Cross-Motions For Summary Judgment.

In its Motion For Summary Judgment (Doc. 65), Dynegy starts by denying that it owed Jolly, a Headwaters employee, a duty of care regarding the inherently dangerous work that Headwaters had contracted to perform at the Miami Fort Station. (*Id.* at #4659). In that regard, Dynegy notes that, under Ohio law, one who employs an independent contractor to perform dangerous work generally owes no duty to protect the contractor's employees from the job's dangers. *See Wellman v. E. Ohio Gas Co.*, 113 N.E.2d 629, 632 (Ohio 1953).

8

Dynegy concedes that there is an exception to this rule for those who "actively participate" in causing the accident. But Dynegy claims that the undisputed facts show that Waldroff (the only Dynegy employee involved in the accident) did not actively participate in the events causing Jolly's death, as that term is used under Ohio law. More specifically, Dynegy argues that Waldroff's role was limited to generally supervising, and minimally assisting, the Headwaters crew regarding the stuck machinery, which does not constitute "active participation." And Dynegy denies that it made either an express or implied warranty about the safety of the Miami Fort Station or equipment used on the premises. Claiming it neither owed Jolly a heightened duty of care nor had an employee actively participate in the events that caused Jolly's death, Dynegy argues that it is entitled to summary judgment on Plaintiffs' claims.

Plaintiffs counter that "Waldroff was directing the work and exercising control over the work activities of the Headwaters' crew, and specifically [Jolly]," meaning Waldroff participated in the events in more than "a mere supervisory capacity." (Pls.' Memo. Contra Mot. Of Dynegy For Summ. J. ("Pls. Mot. In Opp'n"), Doc. 68, #4712). They argue that Dynegy actively participated, through Waldroff, in Jolly's death because Waldroff: (1) had authority over the work site, including which employees entered the tool room and what tools were removed; and (2) assisted in linking the synthetic straps and showing the Headwaters employees how to use a basket connection. In sum, Plaintiffs dispute Dynegy's contention that, as a matter of law, Waldroff's involvement does not meet the "active participation" threshold.

Indeed, not only do Plaintiffs claim that Dynegy is not entitled to summary judgment on the active-participation issue, but they instead believe that Plaintiffs themselves should prevail as a matter of law. (*See generally* Pls.' Mot. Summ. J., Doc. 66). They argue that Defendant is liable for negligently causing Jolly's death. That is so, they say, because Waldroff, and thus Dynegy, (1) actively participated in the events causing Jolly's death, and (2) exercised control over workplace activities and critical variables in the workplace, such as the synthetic slings. (*Id.* at #4684). All in all, Plaintiffs assert that Waldroff knew or should have known that the synthetic slings should not have been used to free the excavator, along with the dangers of carrying out such an operation. (*Id.* at #4694). That, coupled with Waldroff's authority over the tools used in the fatal accident, allegedly entitles Plaintiffs to an entry of summary judgment on their negligence claims. Dynegy opposes Plaintiffs' Motion for similar reasons to those stated in its own Motion For Summary Judgment (Doc. 65).

## DISCUSSION

### A.   Legal Standard For Summary Judgment.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on

its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347.

This Court is not obliged to sua sponte search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable

inferences, and construe the evidence in the light most favorable to the nonmoving party.").

When faced with cross-motions for summary judgment, the framework for each remains the same. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). Merely because both parties have filed for summary judgment does not mean that "the parties consent to resolution of the case on the existing record or that the [Court] is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citing *John v. State of La. (Bd. of Trustees for State Colls. and Univs.*), 757 F.2d 698, 705 (5th Cir. 1985)). Instead, resolving such cross-motions requires "evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quoting *Taft*, 929 F.2d at 248).

**B.    Dynegy Is Entitled To Summary Judgment Because Plaintiffs Cannot Show Dynegy Actively Participated In Events Causing Jolly's Death.**

In general, Ohio law does not impose a duty on a property owner to protect an independent contractor's employee "in connection with execution of the work, who proceeds therewith knowing and appreciating that there is a condition of danger surrounding its performance." *Wellman*, 113 N.E.2d at 632. That means, "no liability for … injury ordinarily attaches to the one who engaged the services of the independent contractor" to perform work that contains "elements of real or potential danger." *Id*. Although owners of premises that host dangerous activity generally owe

12

a duty to keep the property "in a reasonably safe condition" and give warning of "dangers of which [they] ha[ve] knowledge," that duty "does not extend to hazards which are inherently and necessarily present because of the nature of the work performed, *where the frequenter is the employee of an independent contractor*." *Eicher v. U.S. Steel Corp.*, 512 N.E.2d 1165, 1167 (Ohio 1987) (emphasis added). In other words, the independent contractor bears the "primary responsibility for protecting" its employees who engage in inherently dangerous work. *Id.* at 1168.

Even so, Ohio law does not completely shield from liability those property owners who employ independent contractors to perform dangerous jobs. If a property owner or its agent "actively participate[s] in any action or decision that led to the fatal injuries," then the property owner does not enjoy the enhanced protection offered under *Wellman*. *Cafferkey v. Turner Const. Co.*, 488 N.E.2d 189, 192 (Ohio 1986); *see also Bond v. Howard Corp.*, 650 N.E.2d 417, 419 (Ohio 1995). But "active participation" is a significant hurdle; it is distinct from "mere supervision of an independent contractor's work or exhibiting a general concern for safety." *Frost v. Dayton Power & Light Co.*, 740 N.E.2d 734, 749 (Ohio Ct. App. 2000). Rather, active participation involves some degree of *control* over the independent contractor's employee's work activities. *Id.*

Under Ohio law, two types of conduct can amount to active participation. First "active participation giving rise to a duty of care may be found to exist where a property owner either directs or exercises control over the work activities of the independent contractor's employees …." *Sopkovich*, 693 N.E.2d at 243. Importantly,

13

though, latent authority to control the independent contractor's employees does not suffice—the defendant actually must exercise control to become liable. *See Cracraft v. Dayton Power & Light Co.*, No. 26808, 2016 WL 3127304, at *5 (Ohio Ct. App. June 3, 2016) (finding that defendant's coordination of independent contractors on its work site and its ability to modify the scope of the work did not demonstrate active participation).

Second, active participation can arise "where the owner retains or exercises control over a critical variable in the workplace." *Sopkovich*, 693 N.E.2d at 243. The Ohio Supreme Court recognized this "critical variable" theory in *Sopkovich*. There, it held the defendant utility provider, which owned an electric substation, liable for its failure to cut off electricity to a site at which the utility provider had retained independent contractors to provide painting services. *Id.* at 244. Even though the utility company exercised no control over the painters' work activities themselves, the utility controlled the critical variable of the electrical lines that affected the safety of the areas the utility had contracted to be painted. *Id.* at 234–35. So when a painter suffered an injury from painting an electrically charged I-beam on the utility's premises, the utility's control over the electrical lines sufficed as a basis for imposing liability. In effect, *Sopkovich* recognized that a property owner could be liable for injuries to an independent contractor's employees even in circumstances where the property owner never exerted control over how those employees performed their work, so long as the property owner controlled a "critical variable."

Under Ohio law, then, property owners can be liable for injuries to an independent contractor's employee by either: (1) exercising control over the employee's workplace activities, or (2) exercising control over a critical variable on the property that changes the work site's risk profile. Here, Plaintiffs pursue both theories. They assert that Dynegy exercised control both (1) over the Headwaters employees' activities, and (2) over "critical variables" in the workplace, including the synthetic straps, related to Jolly's fatal accident.

1. **_Plaintiffs Cannot Show Waldroff Controlled, Directed, Or Ordered Actions Causing Jolly's Death._**

A property owner employing an independent contractor only exercises control over the contractor's employee's workplace activities if it (1) "directed the activity which resulted in the injury," or (2) "gave or denied permission for the critical acts that led to the employee's injury." *Bond*, 650 N.E.2d 416, 421. Ohio courts distinguish active participation of this sort from "merely exercising a general supervisory role over the project." *Id*. What is more, neither "be[ing] aware of [the independent contractor's] practice … that … created a dangerous situation" nor "exhibiting a general concern for safety" amounts to controlling an independent contractor's employee's workplace activities. *Cornell v. Miss. Lime Co.*, 95 N.E.3d 923, 937 (Ohio Ct. App. 2017); *see also Frost*, 740 N.E.2d at 749. Instead, courts look at the interactions between the property owner and the contractor's employee to decide if the property owner directed or controlled that employee's workplace activities. *See Sopkovich*, 693 N.E. at 244 (finding property owner did not control workplace activities because the property owner, along with its agents, "had virtually no contact

15

with the painting crew"); *see also Stallman v. Midwest Bldgs. & Supply Co.*, No. 18CA16, 2019 WL 4201530, at *6 (Ohio Ct. App. Aug. 27, 2019) (stressing that defendant neither "instructed" nor "required" the independent contractor's employees to perform certain work activities, which meant that defendant was not an active participant).

The mere fact that a property owner *assists* an independent contractor's employee in a dangerous activity that injures that employee does not necessarily amount to active participation; rather, the key test is the property owner's *directing* or *controlling*. For example, one Ohio court held that assisting an independent contractor's employee to remove a tree by looping ropes around a branch did not constitute active participation because "if anyone directed the activities that day, it would have been [the independent contractor's employee]." *Strayer v. Cox*, 38 N.E.3d 1162, 1174 (Ohio Ct. App. 2015). In other words, active participation does not arise in those situations where the independent contractor's employee formulates the workplace activity, and then merely enlists the property owner, or its agent, to help execute the plan.

Similarly, "the provision of materials is insufficient to establish active participation" in activities that the independent contractor's employees perform. *Baker v. Coast to Coast Manpower, LLC*, No. 5-11-36, 2012 WL 2371470, at *7 (Ohio Ct. App. June 25, 2012). That means providing an independent contractor's employee with instruments that result in an injury does not automatically create liability for a property owner. For example, supplying cable cutters, safety glasses, and safety vests

did not establish "active participation" where the property owner providing those materials neither "control[led] nor gave or denied permission for the activity which resulted in the injury." *Id.* In a similar vein, an Ohio court found that owning a ladder and providing it to an independent contractor's employee did not create liability when the employee suffered injuries from falling off the ladder. *Patterson v. Adelta, Inc.*, 119 N.E.3d 982, 986 (Ohio Ct. App. 2018). Because the property owner did not "control how the ladder [was] used" or require the injured employee to use a "specific ladder" in a particular way, merely supplying the ladder did not constitute active participation. As these cases show, neither assisting an independent contractor's employee nor providing him equipment satisfies the active participation exception to Ohio's general rule against imposing a duty of care on property owners who contract for dangerous work to be done on their property. This means Plaintiffs cannot hold Dynegy liable just because Dynegy owned Miami Fort Station and supplied some of the equipment used by the Headwaters crew.

These settled principles of Ohio law doom Plaintiffs' efforts to show that Waldroff's involvement in freeing the immobilized equipment constituted active participation in the events resulting in Jolly's death. Plaintiffs point to the fact that Waldroff allegedly "worked actively with the [Headwaters] crew" and "could have stopped the work" on May 16 and 17. (Pls.' Mot. Summ. J., #4685–86). But that is exactly the kind of latent control that Ohio courts say is not enough. *Cracraft*, 2016 WL 3127304, at *5. Nor is it surprising that Ohio courts would draw that line. Property owners always have the latent authority to prevent guests on their property

17

from performing tasks—the owners can instruct the person to leave. If that level of "control" were enough, then the exception would swallow the rule.

Plaintiffs do not improve their position by underscoring Waldroff's testimony that he participated in executing the plan to extricate the stuck equipment by assisting the Headwaters crew in connecting the straps, clevises, and heavy machinery. (*Id.* at #4691). Merely assisting an independent contractor's employees to perform workplace activities does not amount to active participation. *Strayer*, 38 N.E.3d at 1174.

Plaintiffs come closest to showing Waldroff's active participation in the fatal accident by citing his suggestion to use a basket connection to complete the synthetic strap chain used to remove the stuck excavator, and his guidance on how to accomplish that. They argue that but for Waldroff's involvement, the straps would not have been configured in the dangerous manner that caused Jolly's untimely death. According to Plaintiffs, because Waldroff "gave the direction on how to make the connection between the sling and the bulldozer operated by [Jolly]," Dynegy is liable for the fatal workplace accident. (Pls.' Mot. For Summ. J., at #4692).

But this proposed connection between Waldroff's assistance and Dynegy's liability does not hold. Ohio courts have specified that exercising control over an independent contractor's employees' workplace activities involves something akin to directing, instructing, or requiring that actions be performed by those employees in a certain way. *See Patterson*, 119 N.E.3d at 986. Here, the Court agrees with Dynegy that Waldroff's actions, including those involving the basket connection, did not carry

the compulsive or directive quality that gives rise to active participation. The Headwaters employees, not Waldroff, devised plans about (1) cleaning the chimney drain (resulting in the equipment becoming stuck in the first instance); and (2) freeing the stuck machinery by using heavy equipment linked by synthetic straps. (Waldroff Depo., at #3789–90 (stating that Waldroff "had no idea what [the Headwaters employees] were going to do")). Indeed, Plaintiffs cite nothing in the record showing that Waldroff commanded the Headwaters crew to perform *any* tasks relating to the chimney drains, the excavator, or the track hoe. At most, Waldroff offered a suggestion on how to better execute the Headwaters employees' own plan to free the excavator by showing them how to use a basket connection. But Waldroff neither asked the Headwaters employees to remove the stuck equipment nor instructed them to do so with the materials on hand. To the contrary, Waldroff suggested to Jolly that it might be more prudent to locate better tools or more crewmembers for the job. (*Id.* at #3693). And it was Jolly, not Waldroff, who made the decision to push through with the plan. (*Id.*). Accordingly, the Court declines to find that Waldroff directed, commanded, or in any way exerted control over, the independent contractor's employees during these events.

Finally, Plaintiffs assert that "Dynegy gave permission for use of the synthetic slings and clevises" and "gave permission for the critical act that led to [Jolly]'s injuries and ultimate death." (Pls.' Mot. Summ. J., at #4697). To be sure, the Ohio Supreme Court recognizes granting or denying permission to perform workplace activities as one form of active participation. *Hirschbach v. Cincinnati Gas & Elec.*

*Co.*, 452 N.E.2d 326, 329 (Ohio 1983) ("By denying the Wagner-Smith crew its request to reposition the winch tractor … CG & E actually participated in the job operation by dictating the manner and mode in which the winching phase of the job was to be performed."). But Ohio law permits liability only if the property owner "gave [or] denied permission for the critical acts that led to the decedent's injuries." *Cafferkey*, 488 N.E.2d at 192.

Here, the record does not show that Waldroff granted or withheld permission from the Headwaters as to freeing the excavator or the track hoe. At most, Waldroff granted the Headwaters employees access to the Miami Fort Station tool room and let Jolly select the straps and clevises for freeing the equipment. But Waldroff never granted or denied permission to use those tools to free the track hoe or the extractor, i.e., permission to conduct the critical act. In other words, Waldroff didn't say "you can't use this," or "you must use that." Rather, at most, Waldroff permitted Jolly to select and remove the equipment that Jolly wanted from the tool room. But that "control" falls well short of exercising control over the critical act of freeing the machinery by using a series of synthetic straps. Indeed, as mentioned above, Waldroff suggested an alternative plan for freeing the equipment, an alternative that Jolly shot down. In other words, Waldroff deferred to Jolly's decision-making and expertise with regard to freeing the equipment. Deferring to an independent contractor's employee does not amount to active participation. *See Strayer*, 38 N.E. at 1174. Given the record, the Court finds that, as a matter of law, Waldroff did not exercise control over workplace activities that caused Jolly's fatal accident. Far from issuing

mandates or directives, Waldroff neither attempted to interfere with the Headwaters crew's plans nor gave any affirmative indicia that the crew needed to carry out the plan (or carry it out in a particular manner). In the end, Plaintiffs raise no dispute of material fact that suggests Dynegy exercised control over the Headwaters crew's workplace activities.

### 2. *Plaintiffs Cannot Show That Waldroff Controlled A Critical Workplace Variable Implicated In Jolly's Death.*

Independent of whether the property owner controlled workplace activities related to the accident, courts may also find active participation when the property owner "exercise[d] control over a critical variable in the workplace." *Sopkovich*, 693 N.E.2d at 243. In other words, even if an entity employing an independent contractor did not give directives or mandates to the contractor's employees, the entity can still be liable if it maintained "exclusive control over a critical variable in the workplace." *Bell v. DPL, Inc.*, No. 98CA663, 1999 WL 713589, at *5 (Ohio Ct. App. Aug. 31, 1999). That being said, "[a]n owner's knowledge of the dangerous conditions … and perhaps the necessity for further safety measures, does *not* constitute control over a critical workplace variable when the independent contractor has knowledge of the same facts." *Id.* Here, the Court finds that Plaintiffs have failed to create a genuine dispute on this front, as well.

There is no question that the two avenues for showing active participation under Ohio law are independent. That is, failure to establish that the property owner controlled the work activity does not preclude a finding that the property owner controlled a critical workplace variable. For example, in *Sopkovich*, the Ohio Supreme

Court found the property owner liable because the owner "retain[ed] and exercise[d] exclusive control over a critical variable in the working environment, i.e., the de-activation of specific electrical conductors in the work area" even though the owner "did not participate in the actual work activities of the independent contractor." 693 N.E. 2d at 244. In other words, critical variable analysis looks to the owner's control over "the working environment," rather than control over the actual activities the independent contractor's employees performed, as the basis for liability. *Id.* at 244.

To take advantage of the critical-variable approach, though, a plaintiff must identify something that constitutes such a variable. In *Sopkovich*, for example, the utility that owned the property failed to deactivate electrical circuits for a structure being painted by an independent contractor's employee. The Ohio Supreme Court found that the electrification was a critical variable, and thus the court found liability for injuries relating to the employee who suffered an electrical shock while painting the energized structure. *Id.* at 235. That is, the electrification of the circuits was a variable directly under the utility's control, and also one that dramatically changed the risk profile of the workplace. When the circuit was energized, the workplace was significantly more dangerous (indeed, injury was almost guaranteed) than when not.

Here, Plaintiffs have failed to show Dynegy controlled any aspect of the work area akin to the circuit's electrification in *Sopkovich*. They base their critical variable argument on the undisputed fact that "Dynegy owned, retained and exercised control over … access to and use of synthetic slings being used in the workplace." (Pls.' Mot. For Summ. J., at #4684). And they assert that those slings were both critical to the

accident, and, under Waldroff's control, as "Jason and the Headwaters' crew could NOT have used synthetic slings without being admitted by Mr. Waldroff to the tool room." (Pls.' Reply Mem. in Opp'n, Doc. 71, #4752–53). Thus, they say, Dynegy controlled a critical variable at the workplace.

But that argument proves too much. It seems to suggest that Dynegy is liable because it owned and provided materials used in the efforts to free the stuck excavator. As noted above, though, property owners do not become liable for injuries on their premises merely because they own or provide tools involved in an accident. *Patterson*, 119 N.E.3d at 986. Instead, control over a "critical workplace variable" occurs only when a property owner takes action that directly impacts the safety of the "work area." *Sopkovich*, 693 N.E.2d at 243–44.

Plaintiffs offer no evidence, nor even an argument, that Dynegy acted in a way that made the Miami Fort Station a more hazardous work environment akin to the mistakenly electrified lines that injured the painter in *Sopkovich*. It was not the synthetic straps and clevises themselves that gave rise to the accident. Rather, it was their atypical use as a means of towing heavy machinery that created the risk. And, as already noted, it was Jolly and the other Headwaters employees who decided to use the straps in that fashion. In short, access to the tools was not a "critical variable" that increased the workplace's risk profile as that term is used in *Sopkovich*. Thus, the Court finds that Plaintiffs show no dispute of material fact about Dynegy's control over a critical workplace variable. Because Plaintiffs assert no facts showing that Dynegy exercised control over workplace activities or over a critical workplace

23

variable, they cannot support their theory that Dynegy actively participated in the events resulting in Jolly's tragic death. Accordingly, the Court **GRANTS** summary judgment to Dynegy on the negligence issue.

### 3. *The Court Needs Not Reach Plaintiffs' Warranty Claims And Derivative Claims*

Plaintiffs concede that their warranty claims are "limited to those conditions where the work is not inherently dangerous." (Pls.' Mot. In Opp'n, at #4725). Dynegy does not dispute that the work performed at its Miami Fort Station was inherently dangerous. So, per Plaintiffs' admission, only the active participation analysis under *Sopkovich* applies. (*Id.* at #4725). And, as stated above, the Court finds that Plaintiffs' claims cannot survive that analysis under the summary judgment standard.

Because this Court finds Dynegy's are entitled to summary judgment as a matter of law on the negligence issue, it need not discuss Plaintiffs' claims for pain and suffering, loss of consortium, and punitive damages. Those claims only succeed if Plaintiffs can show Dynegy's liability under a negligence theory. *See Paugh v. R.J. Reynolds Tobacco Co.*, 834 F. Supp. 228, 232 (N.D. Ohio 1993) (dismissing derivative claims, such as loss of consortium and pain and suffering, because the court rejected plaintiff's substantive claims). Thus, the Court **GRANTS** summary judgment to Dynegy on the warranty claims and all claims deriving from Plaintiffs' negligence argument.

## CONCLUSION

For the reasons above, the Court **GRANTS** Dynegy's Motion for Summary Judgment (Doc. 65) and **DENIES** Plaintiffs' Partial Motion for Summary Judgment (Doc. 66). Accordingly, the Court directs the Clerk to **ENTER JUDGMENT** in Dynegy's favor on Plaintiffs' claims.

**SO ORDERED.**

November 10, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**